RYAN ALEXANDER
Nevada Bar No. 10845
RYAN ALEXANDER, CHTD.
3017 West Charleston Blvd., Ste. 10
Las Vegas, NV 89102
Phone: (702) 868-3311
Fax: (702) 822-1133
*Attorney for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| KIZZY BYARS, DANIELLE JAMES, as Individuals and On Behalf of Others Similarly Situated;<br><br>Plaintiffs,<br>v.<br><br>WESTERN BEST LLC, a Nevada Limited Liability Company doing business as THE CHICKEN RANCH; DOES I through X, inclusive, and ROE CORPORATIONS I through X, inclusive,<br><br>Defendants. | Case No.: 2:19-cv-01690-JCM-DJA<br>Hon. James C. Mahan<br><br>**SECOND AMENDED COMPLAINT**<br><br>**CAUSES OF ACTION:**<br>1) **Unpaid Overtime Wages - NRS 608 / 29 U.S.C. §201**<br>2) **Waiting Time Penalties - NRS 608.040**<br>3) **Unpaid Meal and Rest Breaks – NRS 608.019**<br>4) **Hostile Work Environment**<br>5) **Discrimination and Retaliation under 42 U.S.C. §2000e**<br>6) **Discrimination and Retaliation under NRS 613.330**<br>7) **Tortious Constructive Discharge**<br>8) **Intentional Interference with Contract** |

COMES NOW, Plaintiffs KIZZY BYARS ("BYARS") and DANIELLE JAMES "JAMES"), and all others similarly situated, by and through their attorney of record, Ryan Alexander, Esq. of Ryan Alexander, Chtd., as and for their complaint against Defendant WESTERN BEST LLC, a Nevada Limited Liability Company dba THE CHICKEN RANCH; DOES I through X, inclusive, and ROE CORPORATIONS I through X, inclusive (collectively, "Defendants," "CHICKEN RANCH"), and hereby complains, alleges and states as follows:

**PARTIES**

1. Plaintiff KIZZY BYARS is a resident of Hinds County, Missouri and was at all relevant times an employee of Defendant.

2. Plaintiff DANIELLE JAMES is a resident of Dade County, Florida and was at all relevant

1

1. times as an employee of Defendant.

2. 3. Defendant WESTERN BEST LLC, a Nevada Limited Liability Company, is headquartered and doing business in Nye County, Nevada, under the trade name THE CHICKEN RANCH.

4. The true names and capacities, whether individual, corporate, associate or otherwise of other Defendant hereinafter designated as DOES I through X, inclusive, and/or ROE CORPORATIONS I through X, inclusive, who are in some manner responsible for injuries described herein, are unknown at this time. Plaintiff, therefore, sues said Defendant by such fictitious names and will seek leave of the Court to amend this Complaint to show their true names and capacities when ascertained.

5. Upon information and belief, at all times pertinent, Defendant were agents, servants, employees or joint ventures of every other Defendant herein, and at all time mentioned herein were acting within the scope and course of said agency, employment, or joint venture, with knowledge and permission and consent of all other Defendants.

6. The Defendants are jointly and severally liable for each Defendant's actions.

## VENUE AND JURISDICTION

7. Plaintiff brings this action under Title VII of the Civil Rights Act of 1964 to redress the wrong done to them. Such action constituted discrimination on the basis of national origin, race and skin color discrimination, gender discrimination, religious discrimination and retaliation.

8. Plaintiff timely submitted charges of discrimination on the basis of race and color discrimination and retaliation to the Nevada Equal Rights Commission ("NERC") and the United States Equal Employment Opportunity Commission ("EEOC"). The EEOC assumed jurisdiction over Plaintiff's jurisdiction over Plaintiff's charges pursuant to Title 42 United States Code § 2000 (e).

9. Plaintiff JAMES was issued a Right to Sue letter from the EEOC on or about July 26, 2019. Plaintiff BYARS was issued a Right to Sue letter on or about August 5, 2019.

10. Jurisdiction is conferred on this Court by 42 U.S.C. § 2000(e).

11. This Court has supplemental jurisdiction over the remaining claims for relief pursuant to 28

U.S.C. §1367(a).

12. Venue for all causes of action stated herein lies in the District of the State of Nevada pursuant to 28 U.S.C. § 1391 as the acts alleged as a basis for federal claims took place within the boundaries of that district.

**COLLECTIVE AND CLASS ACTION ALLEGATIONS**

13. Plaintiffs bring this action on behalf of others similarly situated as a class action pursuant to Fed. R. Civ. P. 23.

14. Plaintiffs will fairly and adequately represent and will protect the interests of the class, and have retained counsel with experience litigating employment claims.

15. The proposed class includes all of the prostitute employees ("Proposed Class") of CHICKEN RANCH, and the likely class members are so numerous that joinder of all members is impracticable.

16. A collective and class action suit, such as this, is superior to other available means for fair and efficient adjudication of this lawsuit. The damages suffered by individual members of the class may be relatively small when compared to the expense and burden of product defect litigation, making it virtually impossible for members of the Class to individually redress the wrongs done to them.

17. The Proposed Class worked as CHICKEN RANCH employees, and are women. The Plaintiffs who are named here have suffered lost wages, unpaid overtime and breaks, endured hostile work environment, discrimination and retaliation, and the claims or defenses of the representative parties are typical of the claims or defenses of the Proposed Class.

18. Furthermore, even if any member of the Class could afford individual litigation against CHICKEN RANCH, it could and would be unduly burdensome to the judicial system. The collective action is, therefore, the most efficient method by which to resolve these claims.

19. Common questions of fact and law predominate the Proposed Class as a whole. Those include:

    a. Whether Plaintiffs and the Class are properly deemed employees under Nevada law;

  b. Whether Plaintiffs and the Class have sustained damages from unpaid overtime, break periods and meal times, what is the proper measure of their damages and appropriate penalties for nonpayment;

  c. Whether Plaintiffs and the Class have endured a hostile work environment; and

  d. Whether Plaintiffs and the Class have endured discriminatory practices and retaliation under Nevada and federal law.

20. Notice of the pendency and any resolution of these actions can be provided to Class Action members by email, mail, print, or internet publications.

## GENERAL ALLEGATIONS

21. THE CHICKEN RANCH is a licensed CHICKEN RANCH in Nye County, Nevada.

22. Plaintiffs BYARS and JAMES are adult African-American females, and were both employees of WESTERN BEST LLC until the incidents at issue occurred.

23. The Defendants are an operational CHICKEN RANCH and are employers within the State of Nevada and within the jurisdictional coverage of *Title VII of the Civil Rights Act,* 29 U.S.C. §201 and NRS 613.

24. Plaintiff JAMES worked as a legal prostitute at CHICKEN RANCH from November 13, 2016 to September 3, 2018.

25. Plaintiff BYARS worked as a legal prostitute at CHICKEN RANCH from August 6, 2016 until June 25, 2018.

26. Plaintiffs BYARS and JAMES performed their job functions and employment responsibilities.

27. Despite being named 'independent contractors,' as detailed below, Plaintiffs and the Proposed Class members working at CHICKEN RANCH are actually employees under Nevada law.

28. During their employment at the CHICKEN RANCH, Plaintiffs were required to strictly adhere to the policies set forth in the CHICKEN RANCH's Independent Contractor Handbook (the "Handbook").

29. The Handbook included strict rules regarding scheduling, dress code and how to introduce themselves to clients, among other things. Plaintiffs were required to remain on site at the

4

CHICKEN RANCH and be "on-call" twenty-four hours a day, seven days a week.

30. CHICKEN RANCH generally required that Plaintiffs be "properly dressed" by 10:00a.m. and be ready to work.

31. Per the strict dress code set forth in the Handbook, "properly dressed" consisted of high heels and lingerie.

32. The "Lineup" is the CHICKEN RANCH's term for where customers are able to view the women and choose which woman they desire to have a "party" with. CHICKEN RANCH uses "party" to refer to sexual intercourse.

33. Every time that CHICKEN RANCH management rang a certain bell, Plaintiffs were allotted only 3 minutes to personally appear at the Lineup.

34. If Plaintiffs failed to appear for Lineup within three minutes, the CHICKEN RANCH would impose severe financial and other retaliatory penalties.

35. Missing or being late for two (2) or more lineups carried additional penalties and fines.

36. If the customer at the Lineup did not choose Plaintiff(s), then Plaintiffs were required to either mingle at the CHICKEN RANCH bar with other prospective customers, or go to their rooms.

37. If Plaintiffs chose to go to their room, they were not permitted to relax by changing into more comfortable clothes or taking a nap. Plaintiffs were required to remain in lingerie and be ready to participate in another Lineup at any time, on 3 minutes notice.

38. On a typical day, Plaintiffs were served brunch at 11:30 a.m. and dinner at 4:30 p.m. However, despite page seven of the Handbook suggesting that brunch is served from 11:30 a.m. until 12:30 p.m. and dinner is served from 4:30 p.m. until 5:30 p.m., these were not adequate lunch and dinner breaks under Nevada law.

39. Plaintiffs were not permitted to leave the CHICKEN RANCH during meal time and were required to immediately stop their meal "break" if a client showed up. Despite it being a designated meal time, CHICKEN RANCH management would ring the Lineup bell and Plaintiffs only had 3 minutes to get to the Lineup or face penalties and employment consequences.

40. Plaintiffs were not allowed to leave the CHICKEN RANCH at any time during their employment without permission. The only exception was "Day Out Tuesdays," when they were

"allowed" by the CHICKEN RANCH to go into town for a few hours on Tuesday from 8:00 a.m. to 1:00 p.m., and only under the supervision of CHICKEN RANCH staff.

41. Even during these supervised outings, Plaintiffs were still heavily restricted by the CHICKEN RANCH in terms of where they could go and what they could do, being limited to just a few restaurants and shops. Except for "Day Out Tuesdays," Plaintiffs were not permitted to leave the CHICKEN RANCH.

42. Additionally, management at the CHICKEN RANCH required that Plaintiffs create new social media accounts and provided them with an email address that they were required to use while at the CHICKEN RANCH. These social media and email accounts were monitored by CHICKEN RANCH management and could only be accessed while at the CHICKEN RANCH.

43. While the CHICKEN RANCH did require that Plaintiffs have a Nye County prostitution license, there are additional licenses necessary for independent contractors, such as state business registration and a local business license, which were not required by the CHICKEN RANCH for Plaintiffs to work there.

44. Plaintiffs did not have control or discretion over the means or manner of the performance of their work or the result of the work. This was controlled entirely by CHICKEN RANCH management, who imposed strict protocols and rules that Plaintiffs had to follow.

45. As discussed above, Plaintiffs did not have control over the time in which the work was performed, which was entirely controlled by the CHICKEN RANCH. Mandatory lineups would occur at any given time of day or night, making it impossible for Plaintiffs to have control over the time the work was performed.

46. When BYARS attempted to decline participating in a "party" with a client, she was informed by CHICKEN RANCH manager Trudy Kevoian ("Trudy") would exclaim that "[she] can't just turn them all away!"

47. Further, the CHICKEN RANCH set strict requirements as to when Plaintiffs were required to check-in and check-out of the CHICKEN RANCH, which Plaintiffs had no control over.

48. Additionally, the CHICKEN RANCH Handbook states that "[a]ny changes to [Plaintiffs'] schedule will result in a fine of $100 per day for leaving early." This fine, like all other fines

6

imposed by the CHICKEN RANCH, was deducted from Plaintiffs' paychecks, which is unlawful.

49. This type of income penalty consequence is far more akin to an employee's pay being docked for leaving work early, and not the level of control that an independent contractor would have over the time the work is performed.

50. Moreover, while there was no maximum amount of time that Plaintiffs were allowed to work at the CHICKEN RANCH, they were required to work a minimum of two consecutive weeks onsite at a time, during which they were required to exclusively work for the CHICKEN RANCH.

51. During this two-week period, Plaintiffs were not allowed to see clients outside of the CHICKEN RANCH, conduct any other business or have any control whatsoever over their schedule.

52. Plaintiffs had absolutely no authority or discretion to hire employees to assist with their work.

53. Plaintiffs were also entirely subordinate to CHICKEN RANCH management, who, on a daily basis, directed Plaintiffs on how to dress, how to introduce themselves to clients, when and where to eat, and when to sleep.

54. The CHICKEN RANCH Handbook even explicitly requires that the "ladies hold their tongue," if they have an issue or disagreement with the shift manager.

55. While Plaintiffs were required to pay for medical visits and a few other minor incidentals, Plaintiffs did not contribute "substantial investment[s] of capital in the business." Plaintiffs did not purchase or lease required tools, materials, or equipment and securing access to a work space.

56. The CHICKEN RANCH provided a work space on its premises which Plaintiffs were not allowed to 'clock out' and were subject to random room and property searches by CHICKEN RANCH management.

57. Further, the CHICKEN RANCH provided materials and equipment required for Plaintiffs to perform their work, including, but not limited to, a bed, bedding and linen, washer and dryer, laundry detergent, towels, cleaning supplies, paper towels, toilet paper, various outfits to choose from, and a website where potential clients were able to browse the profiles of ladies employed by the CHICKEN RANCH.

58. CHICKEN RANCH Manager Trudy made derogatory statements in reference to African-

Americans and "not to hire them because they are trouble" and they "did not want too many black girls in the house at one time."

59. CHICKEN RANCH Manager Trudy also made derogatory comments to Plaintiffs and other Class Members calling them "Niggers," "Bitch[es]" and "Ho[s]", creating a hostile work environment.

60. Further Plaintiffs BYARS and JAMES were held to unfair and unequal standards that other non-African American, black or brown-skinned employees were not held to.

61. CHICKEN RANCH's managers, supervisors and operators were racist against African-Americans and discriminatory against other employees.

62. CHICKEN RANCH owners and executive management feigned ignorance about the situation, despite reports by Plaintiffs BYARS and JAMES, and other employees to the management.

63. Plaintiffs BYARS and JAMES were scheduled hours that exceeded required breaks and allotted times for meals and without proper compensation.

64. Trudy retaliated against BYARS' complaints of discrimination by telling her that there were no shifts available and subjecting her to different terms and conditions of employment, including moving her to a smaller room.

65. Plaintiff BYARS constructively discharged on or about June 25, 2018.

66. On March 19, 2019, Plaintiff BYARS filed her complaint with the Nevada Equal Rights Commission.

67. Thereafter, Plaintiff BYARS was interviewed and given NERC charge number 0516-19-0055R and EEOC charge number 34B-2019-00647.

68. Plaintiff BYARS signed her Charge of Discrimination documents on May 13, 2019.

69. In late August 2018, JAMES spoke to shift manager Ty [last name unknown], about Trudy's inappropriate comments about black African-Americans; Ty and shift managers Shannon [last name unknown] and Michelle [last name unknown] were aware but did not act to protect JAMES or respond to her concerns.

70. Shortly before September 2, 2018, JAMES was provided with a new employment contract by CHICKEN RANCH management. The new contract contained new fines and rules, which she

believed to be unreasonable. CHICKEN RANCH management forbade her from taking the new contract home for review with her attorney before signing, demanding that she sign it before she left in order to maintain her employment.

71. On or about September 3, 2018, JAMES was termination as retaliation for reporting discrimination.

72. The conditions of Plaintiffs BYARS and JAMES employment were intolerable.

73. CHICKEN RANCH and its principals and managers intentionally created or had knowledge of the intolerable conditions and failed to remedy the situation.

74. Defendants, their agents' and employees' discriminatory and retaliatory conduct created a work environment extremely detrimental to Plaintiffs' emotional and physical health, interfered with Plaintiffs' work, and caused acute emotional distress.

75. Plaintiffs suffered consequential and economic damages because of the retaliatory conduct.

76. The aforementioned acts and conduct by Defendants, their agents and employees were intentional, willful, wanton, malicious, and outrageous.

**Direct Retaliation and Interference Continues After This Lawsuit Was Filed**

77. After this lawsuit was filed on September 29, 2019, CHICKEN RANCH, their agents and employees (presumably Trudy), have engaged in conduct intended to damage, continued to retaliate and willfully engaged in actions to prevent Plaintiffs from obtaining and continuing subsequent employment in Nevada, intended to blacklist Plaintiffs, and to interfere with Plaintiffs' employment relationships.

78. Upon information and belief, on or about January 7, 2020, CHICKEN RANCH contacted another Nevada brothel where JAMES now works and CHICKEN RANCH communicated allegations or materials regarding the accusations of the original complaint to JAMES' current employer.

79. On January 7, 2020, JAMES' current employer began to contact her with further questions regarding this suit, and relayed messages over the following days that appear to be veiled threats originating from CHICKEN RANCH of retaliation and employment consequences.

80. Further, upon information and belief, after September 29, 2019, CHICKEN RANCH

contacted another property that had inexplicably withdrawn ceased hosting JAMES.

81. The aforementioned acts and conduct by Defendants, their agents and employees were intentional, willful, wanton, malicious, and outrageous.

**FIRST CLAIM FOR RELIEF**

**(Failure to Pay Overtime Wages NRS 608.018)**

82. Plaintiffs incorporate and re-allege the foregoing paragraph as if fully rewritten herein.

83. NRS 608.140 provides that an employee has a private right of action for unpaid wages.

84. NRS 608.018(1) provides as follows:
> An employer shall pay 1 1/2 times an employee's regular wage rate whenever an employee who receives compensation for employment at a rate less than 1 1/2 times the minimum rate prescribed pursuant to NRS 608.250 works: (a) More than 40 hours in any scheduled week of work; or (b) More than 8 hours in any workday unless by mutual agreement the employee works a scheduled 10 hours per day for 4 calendar days within any scheduled week of work.

NRS 608.01 8(2) provides as follows: An employer shall pay 1 1/2 times an employee's regular wage rate whenever an employee who receives compensation for employment at a rate not less than 1 1/2 times the minimum rate prescribed pursuant to NRS 608.250 works more than 40 hours in any scheduled week of work.

85. Here, Plaintiffs were on-call twenty-four hours per day while working at the CHICKEN RANCH and regularly worked more than eight (8) hours in a workday. While they were permitted to sleep from 3:00 a.m. to 10:00 a.m. (which was known as "Quiet Time"), they were still required to be "lineup ready" during this time (even while they slept) and party with a client if selected. As a result, Plaintiffs remained in their work clothes during Quiet Time, as they could be required to participate in a lineup at any point with just three minutes notice. At no time were Plaintiffs completely relieved from duty for a long enough period that they could use the time effectively for their own purposes.

86. Therefore, Plaintiffs' on-call time must considered to be payable "hours worked."

87. JAMES worked a total of 159 days onsite at the CHICKEN RANCH, and BYERS worked a total of 148 days at the CHICKEN RANCH.

88. By unlawfully paying Plaintiffs less than the higher-tier minimum wage rate of $8.25 (with

an overtime wage rate of $12.38), Defendants have failed to compensate Plaintiffs at the correct overtime wage rate for all the overtime hours that they worked pursuant to NRS 608.018.

89. Alternately, pursuant to the Federal Fair Labor Standards Act, 29 U.S.C. §201 *et seq.* ("FLSA"), CHICKEN RANCH is classified as an employer under FLSA and the facts described above violate the provisions of FLSA 29 U.S.C. §201*, et seq*. As a result of these unlawful practices described above, Plaintiffs suffered a loss of wages.

90. Plaintiffs were forced to retain Ryan Alexander, Chtd. to prosecute this action, and therefore are entitled to an award of reasonable attorney's fees and costs of suit incurred herein.

## SECOND CLAIM FOR RELIEF
### (Waiting Time Penalties)

91. Plaintiffs incorporate and re-allege the foregoing paragraph as if fully rewritten herein

92. NRS Section 608.020 provides that whenever an employer discharges an employee, wages and compensation earned and unpaid at the time of such discharge shall become due and payable immediately.

93. JAMES was wrongfully terminated on September 3, 2018 and her wages were due to her immediately. Moreover, she did not receive any overtime payments. Therefore, JAMES is now due the full amount under NRS 608.040, which provides the following penalty: If an employer fails to pay:

    a. Within 3 days after wages or compensation of a discharged employee becomes due; or

    b. On the day the wages or compensation is due to an employee who resigns or quits, the wages or compensation of the employee continues at the same rate from the day the employee resigned, quit or was discharged until paid or for 30 days, whichever is less.

94. Additionally, BYARS was forced to tender her resignation on June 25, 2018 and asked that Trudy remove her pictures and video from the CHICKEN RANCH's website.

95. Pursuant to NRS 608.030:

    Whenever an employee resigns or quits his or her employment, the wages and compensation earned and unpaid at the time of the employee's resignation or quitting must be paid no later than:

        1. The day on which the employee would have regularly been paid the wages or compensation; or

2. Seven days after the employee resigns or quits, whichever is earlier.

96. Plaintiffs did not receive any overtime payments. Therefore, they are now due the full amount under NRS 608.040.

97. Plaintiffs were forced to retain Ryan Alexander, Chtd. to prosecute this action, and therefore are entitled to an award of reasonable attorney's fees and costs of suit incurred herein.

### THIRD CLAIM FOR RELIEF

### (Unpaid Meal and Rest Breaks)

98. Plaintiffs incorporate and re-allege the foregoing paragraph as if fully rewritten herein.

99. NRS Section 608.019 provides that an employer shall not employ an employee for a continuous period of eight (8) hours without permitting the employee to have a meal period of at least one half hour. Nevada law also provides that every employer shall authorize and permit all employees to take rest periods, which, insofar as practicable, shall be in the middle of each work period. The duration of the rest periods shall be based on the total hours worked daily at the rate of ten (10) minutes for each four (4) hours or major fraction thereof. Authorized rest periods shall be counted as hours worked, for which there shall be no deduction from wages.

100. Here, the meal and rest breaks provided to Plaintiffs did not meet the requirements under Nevada law for adequate meal breaks or rest periods.

101. While the Handbook states that brunch is served from 11:30 a.m. to 12:30p.m. and dinner is served from 4:30p.m. to 5:30p.m., and that ladies were not required to make a lineup during meal times, this is not how things worked in practice. Rather, the designated hours for brunch and dinner were systematically interrupted by Lineups.

102. On countless occasions, Plaintiffs were expected to stop eating immediately and rush out to the lineup, being instructed by Trudy that "there is no excuse for missing a lineup."

103. Plaintiffs were also required to participate in Lineups even if they were sick or fatigued.

104. Plaintiffs were forbidden from leaving CHICKEN RANCH during "designated meal times."

105. Other than the small exception of the heavily supervised and regulated "Day Out Tuesdays," Plaintiffs were not allowed to leave the CHICKEN RANCH once they "checked in."

106. The CHICKEN RANCH put in place numerous, burdensome limitations on Plaintiffs' "Day

Out Tuesdays," as listed in the Handbook. Among other things, Plaintiffs were told by the CHICKEN RANCH where they could go - they could not leave Pahrump - where they should go and what they should do - only restaurants or stores for shopping or services - and when they were allowed to go - only on Tuesdays from 8:00a.m. until 1:00 p.m.

107. Additionally, while the Handbook states that Plaintiffs could use their own vehicle, ride with someone, call a taxi or use the CHICKEN RANCH car on Day Out Tuesdays, in reality, they were limited to being transported by CHICKEN RANCH staff in a CHICKEN RANCH vehicle so that the Plaintiffs could be supervised during their time away.

108. Plaintiffs were not permitted to use any other means of transport, which is yet another example of the misleading nature of the Handbook and how things worked much differently in practice at CHICKEN RANCH.

109. Accordingly, Plaintiffs were not provided adequate meal and rest breaks, or paid rest breaks, according to Nevada law and are owed back wages and penalties.

110. Plaintiffs were forced to retain Ryan Alexander, Chtd. to prosecute this action, and therefore are entitled to an award of reasonable attorney's fees and costs of suit incurred herein.

**FOURTH CLAIM FOR RELIEF**

**(Hostile Work Environment)**

111. Plaintiffs incorporate and re-allege the foregoing paragraph as if fully rewritten herein.

112. As detailed above, CHICKEN RANCH management created a hostile work environment by regularly using highly offensive and derogatory language when referring to African-American and female employees. Among other things, Trudy commonly referred to African-American employees as "niggers," "nigga" or "negroes." She also repeatedly made discriminatory comments relating to the CHICKEN RANCH's policy of not "hiring new black girls" because they were "trouble" and she did not want "too many black girls in the house at one time." Further, Trudy often referred to female employees as a "bitch" and "ho", as well as threatened to slap female employees on numerous occasions. Plaintiffs, who are African-American women, considered these comments to be highly offensive, abusive and hostile.

113. Moreover, given Trudy's position as CHICKEN RANCH manager, Plaintiffs were

intimidated to report this pervasive, hostile behavior to upper management, especially in light of the Handbook, which states: "If you have an issue or disagreement regarding a Shift Manager please be a lady and hold your tongue."

114. When Plaintiffs and Class Members questioned Trudy directly, they were fined and subject to other penalties.

115. The CHICKEN RANCH's policy was for its employees not to report offensive behavior to upper management.

116. Plaintiffs endured harassment, speech or conduct that is severe or pervasive enough to create a work environment that a reasonable person would consider intimidating, hostile, or abusive and is based on someone's race or sex.

117. Defendant subjected Plaintiffs to verbal or physical conduct based on their African-American race and black/brown skin.

118. Defendant's conduct was unwelcome.

119. The Defendant's discriminatory conduct was sufficiently severe and pervasive to alter the conditions of Plaintiffs' employment and create an abusive working environment.

120. The use of the word 'nigger' is highly offensive and demeaning, as, "perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1116 (9th Cir. 2004).

121. As a direct and proximate result of said acts, Plaintiffs suffered loss of employment, loss of income, loss of other employment benefits, and have suffered and continues to suffer distress, humiliation, great expense, embarrassment, and damage to his reputation, all to Plaintiff's damage in an amount to be determined.

122. The acts theretofore complained of were intentionally done by Defendants and were done with malice and oppression, and, as a result, Plaintiff requests an award of punitive damages in an amount in excess in an amount to be determined.

123. Plaintiffs were forced to retain Ryan Alexander, Chtd. to prosecute this action, and therefore are entitled to an award of reasonable attorney's fees and costs of suit incurred herein.

## FIFTH CLAIM FOR RELIEF

### (Discrimination and Retaliation under 42 U.S.C. § 2000e)

124. Plaintiffs incorporate and re-allege the foregoing paragraph as if fully rewritten herein.

125. The above discriminatory and retaliatory pattern and practice by defendant, its agents and employees, violates *Title VII of the 1964 Civil Rights Act*, 42 U.S.C. §2000e.

126. Plaintiffs engaged in a protected activity, suffered adverse employment actions and there was a causal link between their activities and the employment decisions.

127. Plaintiffs were retaliated against for asserting their rights, including the right to grieve discriminatory practices, and to be free to contract with legal counsel.

128. After this suit was filed, Defendants engaged in acts to disrupt Plaintiffs' subsequent employment.

129. As a direct and proximate result of said acts, Plaintiffs suffered loss of employment, loss of income, loss of other employment benefits, and have suffered and continue to suffer distress, humiliation, great expense, embarrassment, and damage to their reputation.

130. The acts theretofore complained of were intentionally done by Defendants and were done with malice and oppression, and, as a result, Plaintiff requests an award of punitive damages in an amount in excess in an amount to be determined.

131. Plaintiffs were forced to retain Ryan Alexander, Chtd. to prosecute this action, and therefore are entitled to an award of reasonable attorney's fees and costs of suit incurred herein.

## SIXTH CLAIM FOR RELIEF

### (Discrimination and Retaliation under NRS 613.330)

132. Plaintiffs incorporate and re-allege the foregoing paragraph as if fully rewritten herein.

133. The actions of Defendants, its agents and employees, violated NRS 613.330 *et seq*.

134. Further, Defendants continued to retaliate and willfully engaged in actions to prevent Plaintiffs from obtaining and continuing subsequent employment in Nevada, including contacting their employer(s) and discussing this case and its allegations, in violation of NRS 613.200 and 613.330 et seq.

135. Further, Defendants willfully engaged in actions to attempt to "blacklist" Plaintiffs from

obtaining and continuing subsequent employment in Nevada, including contacting their subsequent employer(s) and discussing this case and its allegations, in violation of NRS 613.210.

136.  Plaintiffs were retaliated against, *inter alia*, for asserting their rights, including the right to grieve discriminatory practices and to be free to contract with legal counsel.

137.  As a direct and proximate result of said acts, Plaintiffs suffered loss of employment, loss of income, loss of other employment benefits, and have suffered and continues to suffer distress, humiliation, great expense, embarrassment, and damage to his reputation, all to Plaintiff's damage in an amount to be determined.

138.  The acts theretofore complained of were intentionally done by Defendants and were done with malice and oppression, and, as a result, Plaintiff requests an award of punitive damages in an amount in excess in an amount to be determined.

139.  Plaintiffs were forced to retain Ryan Alexander, Chtd. to prosecute this action, and therefore are entitled to an award of reasonable attorney's fees and costs of suit incurred herein.

## SEVENTH CLAIM FOR RELIEF
### (Tortious Constructive Discharge)

140.  Plaintiffs incorporate and re-allege the foregoing paragraph as if fully rewritten herein.

141.  As described above, the CHICKEN RANCH engaged in an ongoing pattern of racial and gender discrimination, harassment and offensive behavior, as set forth above. The CHICKEN RANCH also imposed unreasonably strict and punitive rules on its employees.

142.  As a result of the hostile working environment and related suffering, BYARS was forced to resign her position. Under the law, this amounts to tortious constructive discharge.

143.  BYARS' resignation was induced by Defendant's actions and conditions that are violative of public policy.

144.  A reasonable person in BYARS' position at the time of resignation would have also resigned because of the aggravated and intolerable employment actions and conditions.

145.  The CHICKEN RANCH had actual or constructive knowledge of the intolerable actions and conditions and their impact on BYARS.

146.  The situation could have been remedied by the CHICKEN RANCH.

147. Plaintiff was forced to retain Ryan Alexander, Chtd. to prosecute this action, and therefore is entitled to an award of reasonable attorney's fees and costs of suit incurred herein.

//

### EIGHTH CLAIM FOR RELIEF

### (Intentional Interference with Contractual Relations)

148. Plaintiffs incorporate and re-allege the foregoing paragraph as if fully rewritten herein.

149. Subsequent to the filing of this lawsuit, Plaintiffs had employment with subsequent employers pursuant to valid and existing contracts.

150. CHICKEN RANCH was aware of Plaintiffs' subsequent employment and CHICKEN RANCH contacted their employers.

151. Upon information and belief, CHICKEN RANCH's principals and employees engaged in coercive, intentional acts intended or designed to disrupt Plaintiffs' subsequent employment, causing actual disruption of their subsequent employment agreements;

152. As a direct and proximate result of the Defendant's actions intended to interfere with Plaintiff's subsequent employment contract(s), Counterclaimant has suffered damages to be determined but in excess of $15,000.00.

153. Defendants are further liable for punitive damages for their intentional interference with Plaintiff's subsequent employment contract(s).

…

### JURY DEMAND

Within Fed. R. Civ. P., Rule 59, the Seventh Amendment to the Constitution of the United States, as well as Article 1, Section 3 of the Constitution of the State of Nevada, or as otherwise may be provided, Plaintiffs hereby demand a jury trial for each of their claims.

…

WHEREFORE, Plaintiffs are entitled to judgment in their favor and against Defendants, jointly and severally, as follows:

1. For an award of past and future damages, including damages for past lost wages and benefits, anxiety, emotional distress, and suffering;

2. For all costs and all attorneys' fees incurred and accrued in these proceedings under NRS 68 or 42 U.S.C. § 2000e-5(k);

3. For interest thereon at the legal rate until paid in full;

4. For punitive and compensatory damages in an amount to be determined by this court; and

5. For such other and further relief as the Court may deem just and proper.

Dated January 24, 2022.

RYAN ALEXANDER, CHTD.

/s/ Ryan Alexander
RYAN ALEXANDER
Nevada Bar No. 10845
3017 West Charleston Blvd., Ste. 10
Las Vegas, NV 89102
*Attorney for Plaintiffs*

**PROOF OF SERVICE**

I am a resident of the State of Nevada, over the age of eighteen years, and not a party to the within action. My business address is 3017 W. Charleston, Ste. 58, Las Vegas, Nevada 89102. On January 24, 2022, I served the within document(s):

**SECOND AMENDED COMPLAINT**

■   ECF System.

> FOX ROTHSCHILD LLP
> DEANNA L. FORBUSH       dforbush@foxrothschild.com
> COLLEEN E. MCCARTY     cmccarty@foxrothschild.com
> *Attorneys for Defendant Western Best LLC*
> *d/b/a The Chicken Ranch*

☐   FACSIMILE - by transmitting via facsimile the document(s) listed above to the fax number(s) set forth on the attached Telecommunications Cover Page(s) on this date before 5:00 p.m.

☐   MAIL - by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Las Vegas, Nevada addressed as set forth below.

☐   PERSONAL SERVICE - by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

I declare under penalty of perjury under the laws of the State of Nevada that the above is true and correct. Executed on January 24, 2022 at Las Vegas, Nevada.

> /s/ *Jennifer Lee*
> An Employee of RYAN ALEXANDER, CHTD.
> *Attorney for Plaintiff*